**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\*\*\*

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

LONNY JOSEPH DITIRRO, JR.,

          Defendant.

Case No. 2:16–cr–00216–KJD–VCF

**<u>REPORT & RECOMMENDATION</u>**

Before the Court are Defendant Lonny Joseph Ditirro, Jr.'s Motion to Suppress Evidence (ECF No. 23), the Government's Response to Defendant's Motion to Suppress Evidence (ECF No. 32), and Ditirro's Reply in Support of Motion to Suppress Evidence (ECF No. 34). For the reasons stated below, Ditirro's Motion to Suppress Evidence is granted in part and denied in part.

## I. Background

On September 9, 2015, Rachel Ismail[1] discovered a Secure Digital card ("SD card") stuck to her leg.[2] *See* Evidentiary Hearing, ECF No. 41 (April 6, 2017). She placed the SD card in her cellphone to check its contents. *Id*. She discovered that the card contained child pornography. *Id.* Upon making this discovery, Ismail immediately removed the SD card from her phone. *Id.* Based on the images she viewed, she concluded that the SD card belonged to her ex-boyfriend, Defendant Lonny Joseph Ditirro, Jr. *Id.*

---

[1] Rachel Saito changed her last name to Ismail after getting married in March 2016. *See* Evidentiary Hearing.

[2] *See Oliver v. SD-3C LLC*, 751 F.3d 1081, 1084 (9th Cir. 2014) (noting that a Secure Digital card is a form of flash memory card that is widely used in consumer electronics devices such as cellular phones and digital cameras).

1

On September 10, 2015, Ismail brought the SD card to her friend and neighbor, Stephen Torrez. *See* Evidentiary Hearing. *Id*. Torrez inserted the SD card into his cellphone and viewed its content. *Id*. He concluded that the SD card contained child pornography and promptly contacted the Las Vegas Metropolitan Police Department ("Metro"). *Id*. A short while later, Metro Officers arrived and viewed the images on the SD card using Torrez's cellphone. *Id*. They determined that the SD card contained child pornography. *Id*. At some point while Metro Officers were at Torrez's apartment, Ismail arrived. *Id*. In addition to describing the images she viewed on the SD card, she told Metro Officers that she believed Ditirro had traveled to Texas to meet an underage girl. Ismail also provided a voluntary statement that memorialized these facts. ECF No. 23-1 at 8. Based on these facts, Metro Officers seized the SD card.

On December 2, 2015, Metro Detective Shannon Tooley applied for and was granted a state search warrant for the SD card. *Id.* at 16. Shortly thereafter, Metro Detective Scott Miller took over this case from Detective Tooley. *See* Evidentiary Hearing. Detective Miller submitted a formal request to process and analyze the SD Card to Metro's forensic lab on February 16, 2016. *Id*. On March 7, 2016, the forensic examiner issued his report. ECF No. 23-1 at 24. Metro examiner Matt Trafford found hundreds of images that he categorized as possible child pornography. *Id.*

In May 2016, Ditirro was arrested on state child pornography charges. ECF No. 23-2 at 2. He was released on bond on his state charges. On June 16, 2016, Ditirro was arrested on a federal arrest warrant. *Id.* at 38. His apartment was also searched pursuant to a federal search warrant. *Id.* Before he made his initial appearance in federal court, Ditirro was interrogated by Detective Miller and FBI Special Agent Sue Flaherty. *Id.* The interview lasted approximately one hour. During the interview, Ditirro provided user names and passwords for his various social media accounts. *See* Evidentiary Hearing. After the interview Ditirro was booked on federal child pornography charges. On July 19, 2016, a federal grand

jury indicted Ditirro on one count of sexual exploitation of a child and one count of possession of child pornography.

Ditirro now moves to suppress evidence found on the SD card, as the fruits of an unlawful search, and his statements during the FBI interrogation, as having been obtained in violation of his Fifth Amendment rights. ECF No. 23.

## II. Discussion

### 1. Ditirro Has Standing to Challenge the Search of the SD Card

"A defendant who voluntarily abandons property has no standing to contest its search and seizure." *United States v. Stephens*, 206 F.3d 914, 917 (9th Cir. 2000). "The abandonment inquiry is primarily a question of intent, and intent may be inferred from words, acts, and other objective facts." *United States v. Mendia*, 731 F.2d 1412, 1414 (9th Cir. 1984). The abandonment determination "is made in light of the totality of the circumstances, and two important factors are denial of ownership and physical relinquishment of the property." *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986).

In *Nordling*, the defendant was escorted off a commercial flight from San Diego to Seattle on suspicion of murder. *Id.* at 1468. The defendant denied having any carry-on luggage, despite being seen with a gray tote bag prior to boarding his flight. *Id.* He left the plane empty handed. *Id.* After being eliminated as a suspect in the murder, law enforcement officers intercepted the tote bag in Seattle. *Id.* at 1469. Inside, officers found nearly a pound of cocaine along with the defendant's wallet and identity documents. *Id.* The trial court denied the defendant's motion to suppress the cocaine discovered in the bag because the defendant had abandoned the bag and thus relinquished any expectation of privacy in it. *Id.*

The Ninth Circuit upheld the trial court's finding that the defendant had abandoned the bag. *Id.* It focused on two objective facts, the denial of ownership and the relinquishment of physical custody. *Id.* Both facts demonstrated that the defendant intended to abandon the bag on the airplane. *Id.*

The Government argues that Ditirro abandoned the SD card when he gave it to Ismail. *See* ECF No. 32 at 20; *see also* Evidentiary Hearing. In support of its argument, the Government cites Ditirro's own admission that he gave Ismail an SD card. *Id.* This statement was made at approximately the forty-five-minute mark of an hour-long police interview. ECF No. 24. This isolated statement, however, does not allow the Court to infer that Ditirro intended to abandon the SD card.

Immediately prior to his admission, Ditirro stated that he had two or three SD cards and gave one of them to Ismail. It is not clear whether the gifted SD card was the same card which contained the child pornography.

Additionally, Ismail's account of Ditirro's behavior around the time she turned over the SD card to law enforcement undercuts the Government's argument. In a November 30, 2015, phone interview Ismail stated that Ditirro had been at her apartment and had lost an SD card. ECF No. 24. Ismail discovered that SD card stuck to her leg. *Id*. Once Ismail realized what the SD card contained, she immediately attempted to get the SD card to the proper authorities. She described Ditirro's behavior around this time as "really wanting it back" and that "[h]e just thought he'd lost it." *Id*.

Although Ditirro did not have physical possession of the card, Ismail's account of his search efforts and the uncertainty regarding whether the gifted SD card contained child pornography support a conclusion that Ditirro did not abandon the SD card. *Nordling*, 804 F.2d at 1469. He has standing to challenge the search of the card.

///

///

4

### 2. Stephen Torrez's Search of the SD Card Does Not Constitute Government Action

"[T]he Fourth Amendment generally does not protect against unreasonable intrusions by private individuals." *United States v. Reed*, 15 F.3d 928, 930-31 (9th Cir. 1994). But "the Fourth Amendment does prohibit unreasonable intrusion by private individuals who are acting as government instruments or agents." *Id.* "The defendant has the burden of showing government action." *Id.*

Courts use a two-part test to determine whether a private individual is acting as a government instrument or agent: "(1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts or further his own ends." *United States v. Miller*, 688 F.2d 652, 657 (9th Cir. 1982).

Ditirro contends that Torrez was acting as a government agent when he searched through the SD card.[3] The police report is unclear regarding whether Torrez searched the SD card before or after Metro Officers arrived. But at the April 6, 2017 evidentiary hearing, Torrez testified that he searched the SD card before the Metro Officers arrived. *See* Evidentiary Hearing. Indeed, statements from Ismail to Torrez that morning about the contents of the SD Card—*e.g.*, that the SD card contained images of Ditirro engaging in sexual relations with a teenage girl she recognized from Facebook—and Torrez's own search and discovery of "explicit images" on the SD card compelled him to call Metro. *Id*. Metro Officers could not have known or acquiesced to any conduct they were unaware of. Therefore, the Court finds that Torrez conducted his search of the SD card as a private actor. The scope of the Metro Officers' subsequent search would be defined by the extent of Ismail's and Torrez's searches.

/ / /

/ / /

---

[3] Ditirro does not argue that Ismail was acting as a government agent when she searched through the SD card. ECF No. 23.

### 3. Metro Officers May Have Exceeded the Scope of the Private Search

"Once frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now-nonprivate information." *United States v. Jacobsen*, 466 U.S. 109, 117, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); 1 William E. Ringel, Searches and Seizures, Arrests and Confessions § 2:3 at 2-44 (2d ed. 2017) ("If a search is initiated by a private person … the fact that the evidence discovered through the search is turned over to the police … does not convert the search into government action"). A defendant's Fourth Amendment rights are "implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated." *Id.* "The additional invasions of respondents' privacy by the government agent must be tested by the degree to which they exceeded the scope of the private search." *Id.* at 115, 104 S.Ct. 1652; Ringel § 2:3 at 2-44.2 ("In determining whether police officers have exceeded the scope of a private search, a court should inquire whether the government learned something from the police search that it could not have learned from the private searcher's testimony … ").

In *United States v. Tosti*, the Ninth Circuit held that law enforcement had not exceeded the bounds of a private search even when they reviewed enlarged versions of previously viewed images. 733 F.3d 816, 822 (9th Cir. 2013). The *Tosti* defendant had left his personal computer with a service technician. *Id.* at 818. While running tests on the computer, the technician discovered thumbnail images depicting child pornography. *Id.* at 819. The technician immediately contacted law enforcement. *Id.* The assigned detective reviewed the images with the technician. *Id.* At one point, the detective asked the technician to enlarge the images and present them in slideshow format. *Id.*

On appeal, the defendant challenged the admission of the fruits of the detective's warrantless search of his computer. *Id.* at 820. It was uncontested that the technician was a private actor and had only viewed the images in thumbnail format. *Id.* at 821. The only issue was whether the viewing of the

enlarged images exceeded the scope of the technician's search. *Id.* The Ninth Circuit held that the detective's search did not exceed the scope of the private search. *Id.* at 822. It was irrelevant that the technician had limited his search to a particular format; the critical inquiry was whether the technician had viewed that specific image. *Id.* If he had, law enforcement could view the same image, in any format, without exceeding the scope of the private search. *Id.*

It is unclear if Metro Officers exceeded the scope of the private searches. In a voluntary statement filled out the day of the incident, Ismail wrote in her own words that she "saw so much porn which included kiddi porn children in full penetration and oral with grown men. Children were 5-10 various ages." ECF No. 23-1 at 8. She also stated that she saw images of "[a] young girl whom graduates 2017 a teen – whom is on Lonny Joseph Ditirro's FB was with him few weeks ago… " *Id.* According to her phone interview with Detective Tooley, however, Ismail "[d]idn't look that far" into the SD card. ECF No. 24. At the evidentiary hearing, Ismail stated that she observed a "restricted file" which contained explicit images involving adult men having sexual relations with young children. *See* Evidentiary Hearing.

Torrez also viewed the content of the SD card on his cellphone. Torrez stated that Ismail told him about the pornographic images involving children that she saw. *See* Evidentiary Hearing. Torrez testified that he did not see all the images. *Id*. But he stated that he looked at enough to immediately call police. *Id*. He also was not sure if Ditirro was in the explicit images he viewed with the underage girls; he just knew there was explicit material so he called Metro. *Id*.

The Metro Officers' report states that they discovered "multiple pornographic images" on the SD card. ECF No. 23-1. The report then goes on to describe the images. One of the descriptions matches an image Ismail claims she had previously viewed. ECF No. 24. At the evidentiary hearing, both Officer Bianco and Officer Wilson testified that they initially viewed several non-pornographic images on the SD card using Torrez's cell phone. *See* Evidentiary Hearing. But when they started seeing pornographic

images involving minors, they stopped their investigation. *See* Evidentiary Hearing. The Officers testified that they never searched through the "Restricted folder" that Ismail mentioned she searched. *Id*. Before viewing the images on the SD card, the Metro Officers relied on Torrez's statements about the images that he viewed and the images Ismail told him she viewed. *Id*.

The Court finds that both Ismail and Torrez were private actors. So, any images from the SD card that Ismail or Torrez viewed are admissible. However, to the extent the Officers viewed images different from Ismail or Torrez, it would violate Ditirro's Fourth Amendment rights and testimony regarding those images should be suppressed. Based on the facts of this case, the Court finds that the Officers viewed images outside the scope of Torrez and Ismail's search and violated Ditirro's Fourth Amendment rights. The Government had the burden to show that the scope of the Metro Officers' search did not exceed that of the private actors. No evidence was presented to support such a finding. Therefore, the Officers' statements or testimony about what they viewed while searching the images contained in the SD card, will be suppressed.

**4. Warrant Issues**

    **a.** *Probable Cause for Search Warrant*

A search warrant must be supported by probable cause. *United States, Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006). Probable cause exists when "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986). Alternatively, probable cause exists when "officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).

"Probable cause demands factual specificity and must be judged according to an objective standard, taking into account the nature and trustworthiness of the evidence of criminal conduct available to the police." *United States v. Struckman*, 603 F.3d 731, 743 (9th Cir. 2010). "[I]n seeking to establish probable cause, officers may not solely rely on the claim of a citizen witness …, but must independently investigate the basis of the witness' knowledge or interview other witnesses." *Id.*

Any images from the SD card that Ismail or Torrez viewed are admissible. Because the Officers' search likely exceeded the scope of Ismail and Torrez's search, the Court will suppress the Officers' statements or testimony about what they viewed while searching the images contained in the SD card. ECF No. 23-1 at 13 ("Officers, using [Torrez's] cell phone viewed the SD card. Officers observed several images of females, who appeared to be under the age of 16, engaged in sexual acts"). But even when excised of those Officers' statements, the December 2015 state search warrant did not lack probable cause.

Ditirro does not contest that Ismail, acting as a private citizen, viewed images on the SD card. Torrez also viewed images on the SD card. When Metro Officers arrived to investigate, Torrez informed them of the explicit images he saw and then allowed them to use his cellphone to investigate. *See* 2 Wayne R. LaFave, Search & Seizure § 3.4(a) (5th ed. 2016) ("… when an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such might not be the case"). Shortly after viewing the content of the SD card using Torrez's cellphone, Ismail arrived. Metro Officers promptly questioned Ismail regarding the SD card. The Court is satisfied that the testimony that Torrez and Ismail provided to the Metro Officers established a fair probability that a crime had been committed. *See United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986); *see also Maryland v. Pringle*, 540 U.S. 366, 370, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) ("[T]he probable-cause standard is a practical, nontechnical conception that deals

with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." (internal quotations and citation omitted)).

Moreover, those images combined with Ismail's November 30, 2015 telephone interview with Detective Tooley further support that there was probable cause. Even if the search warrant lacked probable cause, there would be no Fourth Amendment violation if the Government shows that Metro Officers relied in good-faith on the warrant. *United States v. Leon*, 468 U.S. 897, 920, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) ("In the ordinary case, an officer cannot be expected to question the magistrate's probable cause determination or his judgement that the form of the warrant is technically sufficient").

    **b.** *Delay in Obtaining Search Warrant*

"An unreasonable delay between the seizure of a package and obtaining a search warrant may violate the defendant's Fourth Amendment rights. The touchstone is reasonableness." *United States v. Sullivan*, 797 F.3d 623, 633 (9th Cir. 2015); *but see United States v. Syphers*, 426 F.3d 461, 469 (1st Cir. 2005) (The Fourth Amendment itself "contains no requirements about *when* the search or seizure is to occur or the *duration*") (citing *United States v. Gerber*, 994 F.2d 1556, 1559–60 (11th Cir. 1993)). Courts "determine whether the delay was reasonable under the totality of the circumstances, not whether the Government pursued the least intrusive course of action." *United States v. Hernandez*, 313 F.3d 1206, 1213 (9th Cir. 2002). When considering the totality of the circumstances, courts "must balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interest against the importance of the governmental interest alleged to justify the intrusion.'" *Sullivan*, 797 F.3d at 633 (quoting *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2193, 165 L.Ed.2d 250 (2006)). There is no bright-line rule for unreasonableness. *See United States v. Mitchell*, 565 F.3d 1347, 1352 (11th Cir. 2009) ("… we emphasize again that we are applying a rule of reasonableness that is dependent on all of the circumstances").

On the individual person's side of this balance, the critical question relates to any possessory interest in the seized object. *See Sullivan*, 797 F.3d at 633; *see also United States v. Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012). "A seizure affects only the person's possessory interests; a search affects a person's privacy interests." *Segura v. United States*, 468 U.S. 796, 806, 104 S. Ct. 3380, 3386, 82 L. Ed. 2d 599 (1984).

In applying this balancing test to the seizure of Ditirro's SD card, given the totality of circumstances, the Court finds that the extent of the intrusion on Ditirro's possessory interests were minimal. Ditirro argues that he maintained a significant possessory interest in the SD card because it had personal (non-contraband) pictures, resumes, and documents stored on it. *See* ECF No. 23 at 18. Ditirro does not argue that he could have made use of the SD card if Torrez had not given the SD card to Metro. Ditirro lost the SD card at Ismail's apartment. Ismail found that SD card. She then gave it to Torrez who then gave it to Police. Both Ismail and Torrez refused to tell Ditirro where the SD card was. *See* Evidentiary Hearing. Furthermore, Ditirro had multiple SD cards. He could still use the remaining SD cards in his possession. And Ditirro "never sought return of the property." *Sullivan*, 797 F.3d at 633–34. From the time the SD card was given to Metro Police until the search was completed, Ditirro did not assert a possessory claim to it. *See Burgard*, 675 F.3d at 1033. The Court finds that Ditirro's possessory interests and the actual interference with those interests were minimal.

Turning to the Government's side, the Court must consider the degree to which the seizure and retention of the SD card was necessary for the promotion of legitimate governmental interests. *Sullivan*, 797 F.3d at 634. Under the circumstances of this case, the Government had a reasonable basis for retaining and searching the SD card based on the likelihood that it contained evidence of child pornography. *See Burgard*, 675 F.3d at 1033 ("The state has a stronger interest in seizures made on the basis of probable cause than in those resting only on reasonable suspicion … the Fourth Amendment will tolerate greater

delays after probable-cause seizures"). Furthermore, here, two private individuals freely and voluntarily gave the SD card to Metro Police; the Government did not affirmatively take or seize the SD card from Ditirro.

Ditirro argues that Metro was not diligent in submitting the warrant application and that there was "no discernable excuse in the discovery for Metro's lengthy delay." ECF No. 23 at 18. Torrez gave the SD card to Metro Officers on September 10, 2015. Metro assigned this case to Detective Tooley in late November. Shortly after she was assigned the case, Detective Tooley applied for a search warrant on December 2, 2015. Around the same time, Detective Tooley transferred out of the Internet Crimes Against Children Taskforce to Metro's Sexual Assault Unit. *See* Evidentiary Hearing. Detective Tooley's replacement, Detective Miller, took over Tooley's cases, including the instant case. *Id*. Both Detectives testified at the evidentiary hearing about their heavy caseload at any given time and as a result they were forced to prioritize cases. *Id*.

The Court finds that the Government's course of conduct was reasonable under the totality of the circumstances given the Government's interest in retaining and searching the SD card for evidence of crimes. Even if the Government could have moved faster to obtain a search warrant, the Government is not required to pursue the "least intrusive course of action." *Sullivan*, 797 F.3d at 634. Police imperfection is not enough to warrant reversal. *See Mitchell*, 565 F.3d at 1353 ("… where the resources of law enforcement are simply overwhelmed by the nature of a particular investigation … a delay that might otherwise be unduly long would be regarded as reasonable"). With the benefit of hindsight, courts "can almost always imagine some alternative means by which the objectives of the police might have been accomplished," but that does not necessarily mean that the police conduct was unreasonable. *United States v. Sharpe*, 470 U.S. 675, 686–87, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). To be sure, Metro may

theoretically have been able to work more quickly, but their delay was not the result of bad faith, complete abdication of their work, or failure to "see any urgency."

This case presents different circumstances than *Sullivan*, *Dass*, and *Mitchell*. In each of those cases, the government affirmatively took property allegedly containing contraband as opposed to the present case where two private citizens freely gave the SD card that one of them found to the Government.

In *Sullivan*, the Ninth Circuit held that an unexplained 21-day delay in obtaining a search warrant for a seized laptop was reasonable. *Sullivan*, 797 F.3d at 635. The defendant in *Sullivan* was a parolee and had agreed to warrantless searches of his person and property as a condition of parole. Government agents affirmatively seized several of his personal items, including a laptop computer containing child pornography, during a parole search of the defendant's car. Further, the defendant had given his consent to search the laptop. *Id.* The *Sullivan* court relied on the defendant's lowered expectation of privacy, due to his parolee status and prior consent, to find that a twenty-one-delay was reasonable.

In *Dass*, the government seized over 1000 packages from ten selected post offices in Hawaii as part of a joint state/federal task force assembled to slow the flow of drugs mailed from Hawaii. *United States v. Dass*, 849 F.2d 414, 416 (9th Cir. 1988) (Alarcon, dissenting). They allowed police dogs to sniff the suspicious packages. *Id.* at 414. If the dog alerted, suggesting the presence of marijuana, then the agents would retain the package in order to obtain a search warrant. *Id.* The court held that law enforcement acted unreasonably by detaining packages for 7 to 23 days before executing a search warrant. *Dass* implicitly determined that such a lengthy retention of mailed packages constituted a substantial intrusion into the possessory interests of the individuals who placed the packages in the mail. But *Dass*'s conclusions regarding the interests of a member of the public putting a package in the mail are not applicable here. Most important, *Dass* involved affirmative government planning and action to seize the property at issue potentially containing contraband.

*Mitchell* is also distinguishable from the facts of this case. In *Mitchell*, ICE agents went to the defendant's residence based on their suspicion that he was engaged in distributing and receiving child pornography. *Mitchell*, 565 F.3d at 1349. After the defendant consented to a search of his laptop, the agents removed and retained the computer's hard drive, but did not obtain a search warrant until 21 days later. *Id*. On the narrow facts of that case, the Eleventh Circuit held that the delay was unreasonable because the defendant had a substantial possessory interest in the hard drive, which was likely to contain information "of exceptional value to its owner," and the "detention of the hard drive for over three weeks before a warrant was sought constitute[d] a significant interference with Mitchell's possessory interest." *Id*. at 1351. On the other side of the balance, the court held that there was no compelling justification for the government's delay. Like *Sullivan* and *Dass*, *Mitchell* involved affirmative government action to seize property potentially containing contraband. To the contrary, here, Ismail and Torrez, two private citizens, gave the SD card potentially containing contraband that Ismail found to Metro.

Ditirro does not argue that he made any request for the SD card's return. He had a minimal possessory interest because he lost the SD card at Ismail's residence. Ditirro had multiple SD cards that he could use. On the government-interest side of the balance, the government had a reasonable basis for its delay based on the likelihood that the SD card contained evidence of child pornography. The Court finds that Metro's delay in obtaining and executing the state search warrant did not violate Ditirro's Fourth Amendment rights.

/ / /

/ / /

/ / /

14

### 5. Ditirro's Statements Were Made Voluntarily[4]

"Before a criminal defendant's statement can be used against him, the government must prove its voluntariness by a preponderance of the evidence." *United States v. Leon Guerrero*, 847 F.2d 1363, 1365 (9th Cir. 1988). "An inculpatory statement is voluntary only when it is the product of a rational intellect and free will." *Id.* at 1366.

"A statement is involuntary if it is 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promise, however slight, [or] by the exertion of improper influence.'" *Id.* (quoting *Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976)). "[C]oercive police activity is a necessary predicate to the finding that a confession is not voluntary." *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). "Ordinarily, to determine the voluntariness of a confession, [courts] consider the totality of the circumstances surrounding it." *United States v. Jenkins*, 938 F.2d 934, 937 (9th Cir. 1991).

Ditirro argues that his early morning seizure by armed SWAT Officers combined with his mental impairment and physical discomfort overcame his free will and rendered his statements involuntary. ECF No. 23 at 21. To support his argument, Ditirro cites his responses to the interrogators questions. Some responses allegedly demonstrated his mental impairment, his interests included "drawing [and] basketball" and that adults were "big people." ECF No. 24. Other responses showed that he was under physical duress as he repeatedly complained of light headedness and clouded thinking. *Id.*

His responses do not suggest that Ditirro suffered from a mental impairment sufficient to overcome his free will. Ditirro's interests are not particularly juvenile for a man in his 30s, and Ditirro has not

---

[4] Ditirro emphasizes that his interrogators continued to ask him questions after he allegedly invoked his right to counsel. ECF No. 23. However, Ditirro did not raise the issue of a violation of his Fifth or Sixth Amendment right to counsel in his motion. *Id.*

explained why his interests should be considered a sign of mental impairment. Similarly, Ditirro's statements about adults being "big people" does not indicate mental impairment. Shortly after making this statement, Ditirro clearly explained the age of consent in Nevada as well as the age thresholds for an individual to legally smoke, gamble, and drink. *Id.* In the context of Ditirro's other statements, his "big people" comment was a calculated attempt to play coy rather than a manifestation of mental impairment. Indeed, the Ninth Circuit has held that the threshold for finding a mental impairment severe enough to overcome a defendant's free will is quite high. *United States v. Preston*, 751 F.3d 1008, 1020-21 (9th Cir. 2014)(holding that defendant had a "reduced mental capacity" when he asked detectives to explain the word "disabled"). Ditirro simply does not meet this high threshold.

The Officer's conduct also does not render Ditirro's statements involuntary. The interrogation followed a normal question and answer format. ECF No. 24. At times, Ditirro joked with the interrogators. The conversation was light-hearted and, despite his claims of discomfort, Ditirro continued to answer questions. At worst, the interrogators continued to question Ditirro after he said that he was uncomfortable. However, official persistence is not enough to render statements involuntary. *See Preston*, 751 F.3d at 1022-23.

In *Preston*, police officers asked the defendant to choose between two highly incriminating alternatives, suggested details for the defendant's narrative, and repeatedly asked the defendant the same questions until his responses conformed to their theory of the case. *Id.* at 1023. The Ninth Circuit held that this was the type of egregious police conduct that would render a confession involuntary. *Id.* at 1023-24.

Here, the interrogators' conduct bears no resemblance to the conduct in *Preston*. The Officers were calm, asked straightforward questions, and allowed Ditirro time to answer. ECF No. 24. Even late into the hour-long interrogation, Ditirro continued to joke with the interrogators. This is strong evidence

that Ditirro's free will was not overborne by the interrogators' tactics.  Based on the lack of mental impairment and egregious police conduct, the Court concludes Ditirro's statements were voluntary.

**6.  Ditirro Was Not Subjected to a Two-Step Interrogation**

"[W]here law enforcement officers deliberately employ a two-step interrogation to obtain a confession and where separations of time and circumstance and additional curative warnings are absent or fail to apprise a reasonable person in the suspect's shoes of his rights, the trial court should suppress the confession." *United States v. Williams*, 435 F.3d 1148, 1158 (9th Cir. 2006) (citing *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004)(emphasis in original).

"A two-step interrogation involves eliciting an unwarned confession, administering the Miranda warnings and obtaining a waiver of Miranda rights, and then eliciting a repeated confession." *United States v. Narvaez-Gomez*, 489 F.3d 970, 973-74 (9th Cir. 2007).

Ditirro theorizes that Officers subjected him to a two-step interrogation.  ECF No. 23 at 23.  In support of his argument, he directs the Court's attention to two comments made early in his interrogation. These comments were: (1) "We were talking a second ago" and "(2) Tell me this, 'cause I was asking you at the apartment."  Ditirro contends that these comments demonstrate that he was subjected to at two previous *unMirandized* interrogations.  *Id.*

Read in context, the two cited comments do not support Ditirro's argument.  The first eight minutes of the interrogation consist of general background questions about Ditirro's living arrangements and employment history.  Indeed, Detective Miller's second question specifically referred to the status of Ditirro's driver's license, a background question that was presumably asked when Ditirro was arrested. The testimony of the arresting Officers, Detective Miller and FBI Agent Flaherty, at the evidentiary hearing, belies Ditirros's contention that he was subjected to a two-step interrogation.  *See* Evidentiary Hearing.

ACCORDINGLY, and for good cause shown,

IT IS HEREBY RECOMMENDED that Ditirro's Motion to Suppress (ECF No. 23) be GRANTED in part and DENIED in part.

IT IS FURTHER RECOMMENDED that any evidence initially obtained through private searches of the SD card be admitted. This includes evidence later viewed by Metro Officers so long as such information was first discovered by a private actor. However, the Metro Officers' testimony about what they viewed while searching the images contained in the SD card should not be admitted.

IT IS FURTHER RECOMMENDED that any evidence obtained from Ditirro's interrogation should be admitted.

IT IS SO RECOMMENDED.

DATED this 17th day of April, 2017.

_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE