NICHOLAS A. TRUTANICH
United States Attorney
Nevada Bar No. 13644
ELHAM ROOHANI
Nevada Bar No. 12080
CHRISTOPHER BURTON
Nevada Bar No. 12940
Assistant United States Attorney
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
elham.roohani@usdoj.gov
christopher.burton4@usdoj.gov

Attorneys for United States of America

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| United States of America, | ) |
| Plaintiff, | ) ) ) ) |
| vs. | ) ) ) |
| Lonny Joseph Ditirro, | ) ) ) |
| Defendant. | ) ) ) ) |

Case No.: 2:16-cr-216-KJD-CWH

**Government's Sentencing Memorandum**

## I.    Introduction

<u>Five</u>. The number of identified minors who showed up at trial to testify against Lonny Ditirro – girls who he raped and recorded their sexual exploitation.

<u>Forty-eight</u>. The total number of minor girls whose photos and videos Ditirro meticulously organized into folders on his SD card bearing their first names and ages between 13 and 17 years old; folders that contained child pornography files consistent with the sexually exploitative images and videos of identified victims that Ditirro produced.

254 and 42. The number of images and videos of child pornography Ditirro possessed – depictions that included infants and toddlers being sadistically and violently sexually assaulted by adult men in ways designed to humiliate the children.

140. The bare minimum number of years Ditirro should spend in prison – to provide just punishment, to protect the community, and to give some measure of safety to his victims.

Ditirro is sexual predator who is deserving of a substantial sentence that will naturally produce community safety for the longest period of time available, which is the remainder of his natural life. His patterned actions in this case, his utter lack of remorse, his repeated efforts to justify, deflect, explain away, and otherwise excuse his crimes, all prescribe a statutory maximum sentence for each count to run consecutive. This is especially true given that all of the evidence before the Court suggests Ditirro will not change; but instead will continue to present a significant danger to the community. A 140-year sentence is therefore sufficient but not greater than necessary to further the goals of sentencing. The government also requests a lifetime term of supervised release.

## II.   Factual Background

On September 10, 2015, Las Vegas Metropolitan Police Department (LVMPD) Task Force Officer Shannon Tooley received a police report from Patrol Officers Nicholas Bianco and Garrett Wilson referencing a child exploitation call for service. Officers contacted Rachel Saito, who was previously in a relationship with Ditirro. Saito reported that she found a SanDisk Micro SD card in her bed that belonged to Ditirro. Saito stated she viewed the contents of the SD card and found what she believed to be child pornographic images. Officers viewed contents of the SD card and observed several images

of females who appeared to be between 13 and 15 years of age engaged in sexual acts. Officers impounded the SD card into evidence and notified Detective Tooley.

On November 30, 2015, Detective Tooley conducted an interview with Saito. Saito described that she and Ditirro had begun dating in early 2015. Saito stated that Ditirro moved into her apartment to live with her shortly after that they began dating. Around September 9, 2015, while in bed, Saito discovered the SD card stuck to her leg. Saito stated that she believed the SD card belonged to Ditirro as he had been asking her if she had seen his SD card. Saito viewed the contents of the SD card and found images of Ditirro, both clothed and nude, images of child pornography, and other photos of Ditirro engaged in sexual acts with a female who appeared to be under 16 years of age.

On December 2, 2015, Detective Tooley obtained a search warrant to seize and perform a full forensic examination on the SD card. On March 7, 2016, LVMPD Forensic Analyst Matt Trafford completed a forensic examination on the SD card. He found 235 images/videos of Ditirro on the SD card, in folders titled "Me," which included "selfies" of Ditirro, and "Me Restricted," which included naked "selfies" of Ditirro. Forensic Examiner Trafford also found Ditirro's resume and birth certificate, showing ownership.

Forensic Examiner Trafford bookmarked 254 images and 42 videos of child pornography saved on the SD card in carefully curated folders. 56 of the images depicted infants and toddlers and five images depicted sadomasochism and violence. For example, one image depicted a nude pre-pubescent female child lying on her back, with an image of a playboy bunny drawn above her vagina and the words "Fuck Me" written on her pelvis. An adult male's erect penis is seen above the child dripping with ejaculate onto her chest and stomach. Another adult male's erect penis is penetrating her anus. Another photo depicts an adult male with an erect penis ejaculating into the mouth of a female child. Yet

3

another video shows a nude adult male lying on his back with an erect penis while a nude pre-pubescent female child is straddling the adult male. The male is penetrating the child's vagina with his penis as he has vaginal sex with the female child.

In addition to these images of child pornography, Ditirro had organized and catalogued dozens of folders titled with the name and age of nearly 50 girls. For example: one folder was titled "T.H. 13" and another was titled "R.B. 14." There were 48 folders titled with the names of girls and ages ranging from 13-17 years of age. These folders included photos of the girls, videos of Ditirro having sex with/raping the girls, and letters and text messages about how some of the girls were in love with Ditirro. The number after each girl's name in the folder title appeared to be the age of the girl depicted in the folder.

Upon his arrest, Ditirro was *Mirandized* and voluntarily spoke with law enforcement. Ditirro admitted that he did not have a computer, but rather that he used his cell phone and SD cards to save information and data. Ditirro admitted that he only had two cell phones in the past, both Android smartphones – a Samsung S6 and an earlier model S4. Samsung phones are not manufactured in the State of Nevada. The SD card was also not manufactured in Nevada.

Law enforcement subsequently identified four of Ditirro's victims from the SD card. Ditirro's convictions on the first four counts in the Superseding Indictment relate to those four victims – R.B., C.A., S.M., and T.H.

**R.B.**

R.B. told officers, this Court, and the jury, a harrowing story. When she was 14, she met Ditirro through a social media chat application called Meet Me. The application allows individuals to get in touch with other people nearby and arrange to meet. R.B. began talking to Ditirro but eventually ended the conversation. Ditirro located R.B. on

Facebook, found out where she lived, and then showed up at her house uninvited. R.B.
stated that Ditirro forcibly raped her both vaginally and anally on her back porch. A video
in the "R.B. 14" folder on Ditirro's SD card corroborated R.B.'s story, as the backyard
porch furniture was still present at the home years later. The Court and jurors saw videos of
this rape that took R.B.'s virginity.

R.B. told law enforcement that Ditirro continued to contact R.B. after this rape,
sending her naked photos of himself, and used extortion and threats (to disclose the video
he made of the rape to her religious family and physically harm her family) to get R.B. to
send more naked photos of herself to him. These photos are also in the "R.B. 14" folder.
R.B. further related that Ditirro raped her a second time, again on her back porch. R.B.
stated that Ditirro recorded the rapes with a black smartphone, which corresponds to
Ditirro's statement that he had Android/Samsung smartphones.

R.B.'s trial testimony was consistent with her statement to law enforcement.[1] As the
Court and jurors saw, R.B. continues to be visibly impacted by the rape at the hands of
Ditirro years later.[2] Over the course of the past few years, R.B. has suffered from social

---

[1]     Ditirro's most recent claim that R.B. was lying because she allegedly told Ditirro
over text that she was raped prior to being raped by him is factually unsupported and just
another attempt to detract from his unquestionable guilt. Aside from the fact that it is
irrelevant who else may have sexually assaulted R.B. before or after Ditirro, in reality, the
text to which Ditirro is referring is R.B.'s text *to a later actual boyfriend that she had been raped
by Ditirro*. To be abundantly clear, R.B. has been raped by only one person –Ditirro. He
stole her virginity, her childhood, her innocence, her sense of security in her own home, and
her mental well-being. His most recent fabrications are nothing more than a continued
attempt to harass and humiliate R.B. The government, for one, is not distracted by Ditirro's
reprehensible attempts, and this Court should not be either.

[2]     In preparing this sentencing memorandum, R.B. noted to the prosecutor that her pre-
trial meeting was particularly traumatic because she had a vivid flashback to the rape.
Government counsel remembered this pre-trial meeting where R.B. recounted the rape. The
prosecutor was particularly troubled when R.B. spoke about Ditirro touching her neck, as
he is seen to do on one of the videos. As R.B. was speaking, it seemed that she was having

anxiety, depression, and suicidal ideations due to these rapes. Her relationship with her family suffered, and she suffered post-traumatic stress due to returning each day to the place she was raped – her own home. R.B. began self-harming, cutting herself to ease the pain from the constant reminders of the rape and mental anguish from Ditirro's extortion. In her own words, R.B. had "her childhood ripped out of her by a predator who can only think of one thing, hurting the people who he sees as weak and easy prey." Last year, as the trial date was approaching, R.B.'s anxiety and fear caught up to her when she attempted suicide and was almost successful in overdosing on drugs. This resulted in a hospital stay and substantial medical bills.

R.B. continues to fear for her safety <u>to this day</u> – now that she has testified against Ditirro, she fears that he will come find her and "do everything all over again." All of this terror stems from one person – Lonny Ditirro.[3]

R.B.'s mother and father recount that R.B. used to be a happy child but just before her 15th birthday – because of Ditirro – R.B. became suddenly sullen and secretive. When her parents took away her phone, R.B. acted like an addict looking for her next fix. But, in reality, the root of R.B.'s extreme anxiety over the loss of her phone was her terror that Ditirro would follow through on threats to physically harm her family and disseminate the sexual exploitation videos he had created of R.B. to her family, friends, school, and church, unless she timely complied with his demands to send still more images and videos of sexual exploitation. As a result of Ditirro's rape and extortion, R.B. obsessively changes her cell phone number, i.e. a total of five times just this year. R.B.'s mother is concerned because

---

an out of body experience. R.B. was clawing at her neck to the point of drawing blood, reenacting the disgust she felt at having Ditirro's hands on her virgin body.

[3]   R.B. has completed a victim impact statement, which is filed under seal as Government's Exhibit 1.

R.B. is unable to maintain healthy relationships and friendships and R.B. has never processed the harm caused by Ditirro. It is heartbreaking for a parent to watch their child live in mental anguish and express suicidal thoughts. To help R.B., her parents have put their house (the place R.B. was victimized) up for sale to rebuild their family. Ditirro did not just destroy R.B., he destroyed her parents' happiness and security as well.[4]

**C.A.**

In 2014, C.A. was 15 years old when Ditirro initiated contact with her via Meet Me. He initially told her he was 15, but later told her he had graduated high school in 2014. C.A. told Ditirro she was a minor. He asked her to send nude images and videos to him and said if she did, he would buy her an iPhone. He sent her pictures of himself masturbating. The exchange of nude pictures and videos was done via Kik Messenger. C.A. said she felt forced to send the nude images. Like with R.B., Ditirro extorted and blackmailed C.A. to obtain her photos.

At one point, C.A. broke her iPod and could no longer have any contact with Ditirro; she felt happy to not have to communicate with him. During their conversations, Ditirro told her he wanted to marry her and that he was going to buy her an engagement ring. In classic grooming behavior, Ditirro said if C.A. would have sex with him, he would buy her other things.

C.A. was shown pictures taken from Ditirro's SD card folder with her name. C.A. identified the images as being of her in her bedroom. As she identified the photos, C.A. broke down crying, saying that on one occasion Ditirro asked if he could come over to her house in Las Vegas, Nevada to "hang out." Ditirro told C.A. they would just hang out

---

[4]     R.B.'s parents have completed a victim impact statement, which is filed under seal as Government's Exhibit 2.

outside in the front of her house, so she gave him her address. C.A. said at the time he came over, her mom was out of town and her dad was at work. C.A. was on the upstairs balcony when she saw him get off a bus and walk to her house. When she opened the door, Ditirro, who is more than a foot taller and close to 200 pounds heavier than C.A., pushed his way in the house and shoved C.A. down on the couch. He then carried her upstairs to her bedroom, shut the door, and forced her onto her bed. C.A. asked him to leave. Instead, he removed her clothing and his own.

C.A. remembered just wanting to call 911, but not having a phone. C.A. then said he did "sexual stuff" to her; he made her suck his penis by pushing her head down on him. He tried to have anal sex with her at one point. She then said he raped her. While Ditirro was raping her, he had his white cell phone in his hand, recording the sexual assault. C.A. asked him to stop and tried to push him away. He told her he wanted to get her pregnant at 15 years old. At one point he instructed her to call him "daddy." At the conclusion of the interview (while crying), C.A. said he traumatized her. This was the rape C.A. testified to during trial.

In the C.A. folder, there are 56 images files, 8 of which depict C.A. nude. There are 10 videos in the C.A. folder, six of which depict Ditirro raping C.A. in her bedroom. These six videos depict Ditirro orally and vaginally assaulting C.A. In one video, C.A. is kneeling on her bed with her buttocks raised. Ditirro is kneeling behind her with his penis inserted into her vagina. As he holds her down, Ditirro can be heard saying "You like that big dick, baby?," "Say 'I love that big dick'," "See, I told you, you couldn't keep quiet with my big dick."

///

///

8

1     **<u>S.M.</u>**

2          S.M. met Ditirro when she was 15 years old on Meet Me. His profile said he was 17

3     years old and had picture of himself. S.M. said Ditirro showed her a driver's license, Social

4     Security card, and birth certificate, all stating he was 17 years old. Some of these falsified

5     documents were found on Ditirro's S.D. card. They chatted for couple of months. After

6     two weeks, Ditirro asked for nude pictures of S.M. and sent her nude pictures of himself

7     via Kik. He sent her a picture of his penis and asked if she "liked that." They chatted about

8     sex.

9          Just before Christmas, while in her freshman year in high school, S.M. asked her

10    mother if Ditirro could come visit for Christmas. Prior to his arrival, S.M.'s mother looked

11    online and found information that Ditirro was 34 years old. S.M. confronted Ditirro about

12    his age and he denied being 34 years old. This was one of the times Ditirro sent S.M. a

13    falsified document showing he was 17.

14         Ditirro traveled to Texas twice to have sex with S.M. The first trip, they had sex two

15    or three times. During the second trip, S.M. was 16 years old. They had sex two times

16    during that trip. Once during this visit, Ditirro began to forcibly rape S.M. and would not

17    stop. S.M. tried to kick her legs up to get Ditirro off her body but Ditirro pushed her down

18    and S.M. hit her head on the headboard. Unbeknownst to S.M., Ditirro recorded one of

19    these rapes.

20         In May 2016, S.M. was contacted by a girl on Facebook, later identified as A.P.,

21    who told S.M. if she is contacted by the police, she is to say she does not know Ditirro.

22    S.M. asked A.P. why she contacted S.M. and A.P. told S.M. there was an "SD card that

23    had a bunch of nudes on it." A.P. told S.M. about a video showing S.M. and Ditirro

24    having sex. Because S.M. did not know about the video, S.M. did not believe Ditirro

1  would record her. A.P. then called S.M. and Ditirro got on the phone and told S.M. he was

2  in trouble with the cops and told her that "she doesn't know him if something were to

3  happen." Ditirro's actions amounted to witness tampering and obstruction.

4      S.M. was shown pictures printed from Ditirro's SD card. One picture was a screen

5  shot taken during a Skype chat between Ditirro and S.M. and depicts S.M. nude in her

6  bedroom and Ditirro's face in the corner of the photograph. S.M. testified she did not know

7  he had captured screen shots of these chats. She said she was 15 years old in that picture,

8  and was certain of her age based on her bedroom décor.[5]

9      Inside the S.M. folder on Ditirro's S.D. card are three subfolders: (1) "S" – which

10  contains 66 images of S.M. clothed, one being a picture of S.M. and Ditirro together; (2) "S

11  naked" – which contains 121 images, 91 of which depict S.M. nude or partially nude ; and

12  (3) "S skype" – which contains 156 screen shots of Skype communications, 65 of which

13  depict S.M. nude or partially nude and most showing Ditirro's face.

14      While S.M. puts on a brave face, her victim impact statement shows her continued

15  turmoil over her "relationship" with Ditirro. S.M. recognizes that she was one of the first

16  girls victimized by Ditirro, and for that, she blames herself for not speaking up sooner. It is

17  also telling that *before* S.M. talks about her own distress, she remembers the pain shown on

18  the other victim's faces and cares for their well-being. S.M. is particularly reflective as she

19  remembers seeing the photo of C.A. in the exhibit book: "She was tan with black hair with

20  a hand around her neck. Being forced to endure the pain of what he put her through was

21  written all over her face." In fact, S.M. rightfully took solace in the fact that her face was

22

23      [5]    S.M. has completed a victim impact statement, which is filed under seal as
Government's Exhibit 3. Additionally, S.M. also provided the government with medical

24  documentation stating her need for therapy as a result of Ditirro's sexual exploitation of her.
That document has been filed under seal as Government's Exhibit 4.

not shown in the videos found in her folder. While she could clear identify herself, no one else will know it was her, in the event that Ditirro distributed these videos.[6] The lingering effects of Ditirro's abuse continue to haunt S.M. – she crashed her brand new car after being distraught from her trial testimony, she needs mental health counseling, and her doctor has recommended a therapy animal to alleviate the anxiety she feels as she copes with her exploitation. S.M's mother is saddened that she "can't fix the hole in [her] daughter's heart and soul."[7]

These are the kind, caring, compassionate girls that Ditirro targeted, victimized, and destroyed. And, to this day, these girls have unanswered questions: "All I could think was, why would he have taken advantage of us? Was there a reason for all of this? Was this a sick game? Why did he lie? Why fake so many emotions? Just FUCKING WHY?" They know they will never get answers to these questions, but they already saw during their testimony what Ditirro thought of himself written all over his face: "looking very smug with himself," as if to say "what are you doing here? Didn't you like what I did to you?"

**T.H.**

In early 2013, when T.H. was 13 years old, she met Ditirro on Meet Me. Ditirro claimed he was 18 and the two began messaging back and forth. Ditirro quickly initiated sexual conversations with T.H. and ultimately asked to trade nude photographs over Kik. T.H. complied and sent nude photographs of herself to Ditirro over Kik at his request. During this time, T.H. lived in Arizona but she visited her relatives in Las Vegas in June 2013. Throughout that month, Ditirro and T.H. met up every day and had sex. On at least

---

[6]     The same cannot be said for the nude photos depicting S.M.
[7]     S.M.'s mother has completed a victim impact statement, which is filed under seal as Government's Exhibit 5.

11

two occasions to T.H.'s knowledge, Ditirro recorded having sex with her. Although T.H. was aware of the recording, she can be seen in the videos covering her face and otherwise looking away from the camera. The videos were recorded with Ditirro's phone.

On November 4, 2016, T.H. appeared at a family advocacy center in Arizona for an interview with law enforcement. T.H. did not want to participate in the interview. T.H. was told the interview was regarding Lonny Ditirro. T.H. said she knew the name but did not want to provide any further information which would add charges or increase the length of a prison term for Ditirro. T.H. ended the interview by saying she would like to never be bothered about this situation again. In her victim impact letter, filed under seal as Government's Exhibit 6, T.H. explains her reluctance to cooperate.

> I was just one of his countless victims but coincidentally I was also one of the few who were uprooted from our everyday lives and called to testify in October 2018. I was first contacted by the FBI in 2016. I declined to speak about this uncomfortable situation and I remained silent until October 2018 when I was served a subpoena outlining my mandatory appearance at the trial that was set to commence a few weeks later. I remained silent until trial for many reasons.
>
> One of the main reasons being my lack of knowledge about who Lonny was, even six years after he had victimized me. Up until October of 2018 I was unaware that Lonny had preyed on me solely because he is a child predator. I had no idea that he kept videos of me as a child, in his possession for years. I was unaware of all of the gruesome facts that were presented at trial, and I was unaware that Lonny is aged well into his 30's. Had I known that Lonny is a child predator, I would have participated in the case much sooner than I did.

As T.H. explains, when she met Ditirro online, she never had a boyfriend or even her first kiss. She "was a child." He manipulated her. What they had "was not a relationship, it was a way for him to sexually abuse" her. At trial, T.H. testified that Ditirro

12

took her virginity when she was just 13 years old, and recorded these rapes against T.H.'s will. According to T.H.,

> In the moment, I felt very confused. I didn't know why he was recording me, all I knew is that I did not want to be recorded. I covered my face, shied away from the camera, I did everything I thought might make him stop, but he didn't stop. He recorded several different sexual acts involving me when I was only 13 years old, and then he kept them only for them to be discovered by law enforcement years later.
>
> As an adult, it is hard for me to comprehend that there are videos of myself as a child having sex with a man in his 30's. Lonny recorded these videos without my consent and then he tried to pressure me into watching them. I was completely disgusted at the fact that he recorded the videos, so I refused to watch them. I never actually saw any portion of the videos until they were played at trial.

Contents of the T.H. folder on Ditirro's SD card include 584 files – 579 images and 5 videos. Approximately 95 image files are of T.H. nude or partially nude. Four of the five videos depict Ditirro and T.H. in what appears to be a girl's bedroom engaged in various sex acts. During her testimony, T.H. identified this room as the place she stayed during her trip to Las Vegas in June 2013. The videos show Ditirro having oral and vaginal sex with T.H. Throughout the videos, T.H. can be seen covering her face and otherwise avoiding the camera recording her.

**A.P.**

In July 2015, when A.P. was 15 years old, she met Ditirro on Meet Me. A.P. put her accurate age on her Meet Me profile and Ditirro's profile stated that he was 15. The two began messaging each other. Ditirro then encouraged A.P. to have Skype chats with him. During some Skype chats, Ditirro asked A.P. to send him nude photographs and also directed A.P. to take her clothes off and pose for him. Unbeknownst to A.P., Ditirro took

13

screen shots of these Skype conversations which depicted A.P.'s nude body.[8] During the course of their contact, A.P. began doubting Ditirro's claimed age. When she confronted him, Ditirro provided his driver's license, but covered his date of birth. Ditirro also directed A.P. to look at his Facebook profile, which stated his birthday was in 1992, making him approximately 23 years old.

Subsequently, A.P. and Ditirro met in person. The sexual conversations continued and, on one occasion, Ditirro tried to show A.P. the video he had recorded of raping R.B.[9] Ditirro also showed A.P. a video he took when he raped C.A., who he said was 15 at the time of the video.

After Ditirro's arrest in this case, he contacted A.P. and asked her to reach out to "a girl in Texas." Ditirro told A.P. that he had traveled to Texas and had sex with a 15-year-old girl and there were pornographic photographs and videos of her on his device. At Ditirro's request, A.P. contacted the girl from Texas and asked her to lie to the FBI if they came and asked her questions about Ditirro.

**Other Relevant Conduct and Considerations**

As stated above and shown at trial, Ditirro methodically organized and catalogued his collection of photographs and videos of child exploitation. As the below screen shot of a small portion of the folders contained on Ditirro's SD card demonstrates, the charged victims are hardly the only victims of Ditirro's sexual exploitation. Rather, the charged victims are simply those who have been identified by law enforcement at this time.

---

[8]   The nude screen shots of A.P., which were subsequently found on the SD card, supported the charge of possession of child pornography.

[9]   Although A.P. did not know R.B., she testified the video was of "R" and was taken outside at night. A.P. also testified that Ditirro told her the video was taken at R.'s house when R. was 14. This description is consistent with the video depicting Ditirro's rape of R.B.



Aside from the charged victims, and the more than 30 other girls similarly sexually exploited by Ditirro and catalogued in folders on the SD card that have not yet been identified, Ditirro also victimized complete strangers. In a series of particularly disturbing videos, Ditirro recorded "upskirt" videos of women walking on the Las Vegas Strip. These images are contained in the government's trial exhibits, but were not published to the jury.

Finally, the Court has seen some of the images of child pornography saved on Ditirro's SD card. What the Court cannot compare without seeing all the images is the average age of the children depicted in those videos. Ditirro's preferred age range is under eight years old. Moreover, Ditirro's preference is images and videos that depict sexual humiliation of children, including adults ejaculating on children's faces and adult men penetrating female children's vaginas with an erect penis.

### III.   Discussion

#### A. Application of Sentencing Guidelines

    i.   <u>The enhancement for committing an offense involving a minor between 12-16 years of age is appropriate under U.S.S.G. § 2G2.1(b)(1)(B).</u>

A two-level increase is appropriate under U.S.S.G. § 2G2.1(b)(1)(B) if the sexual exploitation involved a minor between the age of 12 and 16. Here, all four of the charged sexual exploitation victims were between the age of 12 and 16 when they were exploited. As such, this enhancement is appropriate and should be applied.

In his sentencing memorandum, Ditirro contends that the evidence concerning the age of S.M. is insufficient to support this enhancement as to her. ECF No. 138, p. 6-7. He contends that the enhancement should therefore be stricken and his total offense level should be reduced to 41. *Id.* Ditirro is incorrect on a number of levels. First, S.M.'s testimony is sufficient for this Court to find, as a matter at sentencing, that this

enhancement applies. Second, and perhaps more importantly, even if this Court agrees and strikes the recommended enhancement, it does not change Ditirro's total offense level. The challenged two-point enhancement concerns Count Three/Group Three. That group results in an adjusted offense level of 44 and is the greatest of the adjusted offense levels. However, even if the adjusted offense level was a 42 as a result of eliminating the challenged enhancement, there would still be a four-point increase under U.S.S.G. 3D1.4 and a five-point increase under U.S.S.G. 4B1.5(b)(1). As such, the total offense level would be 51, which would then be reduced to level 43 under the Guidelines. As such, Ditirro's challenge is a distinction without a difference.

ii.  The enhancement for commission of a sexual act is appropriate under U.S.S.G. § 2G2.1(b)(1)(B)(i) and (ii).

A four-level enhancement is applied to the commission of a sexual exploitation offense if it includes a sexual act prohibited under 18 U.S.C. 2241(a). That statute proscribes a person from knowingly engaging in a sexual act with another person by force or threat of death, substantial bodily injury, or kidnapping. Here, the four-level enhancement is applicable to all four of the charged sexual exploitation victims. R.B. and C.A. testified that Ditirro had sex with them through use of force. S.M. also testified that, at least on one occasion, Ditirro had sex with her through use of force. Finally, T.H. has also indicated to this Court, through her written letter, that she was manipulated and forced to have sex with Ditirro. As such, this four-level enhancement is appropriate and should be applied.

///

///

///

17

iii.   <u>The enhancement for sadistic and masochistic depictions is appropriate under § 2G2.1(b)(4).</u>

Ditirro's production of child pornography included the vaginal rapes of his victims. As such, and on that basis alone, this enhancement properly applies. Further, Ditirro's child pornography collection included multiple files depicting the anal and vaginal rape of prepubescent minors, as well as additional acts of humiliation as described above. The nature of these files also supports a finding that this enhancement applies.

iv.   <u>The enhancement for obstruction of justice is appropriate under U.S.S.G. § 3C1.1.</u>

An enhancement for obstruction as to Count 3 is supported by Ditirro's efforts to tamper with S.M. At his direction, A.P. contacted S.M. and told her to deny knowing Ditirro if law enforcement spoke to her. When S.M. questioned why, A.P. stated that Ditirro had nude photographs of S.M. taken when she was a minor and that law enforcement had discovered the photos. Ditirro also directly contacted S.M. in an effort to obstruct law enforcement's efforts to investigate the case. These efforts to obstruct justice and the investigation into Ditirro's sexual exploitation of S.M. warrant the obstruction of justice enhancement.

v.   <u>The enhancement for material depicting prepubescent children is appropriate under U.S.S.G. § 2G2.2(b)(2).</u>

Ditirro's collection of child pornography included photos and videos depicting prepubescent minors engaged in sexual acts. Some of these files are described in the Presentence Investigation Report and some of the images were admitted as evidence during trial. As such, this enhancement is appropriate.

///

///

18

1            vi.   <ins>The enhancement for engaging in a pattern of activity involving the</ins>

2               <ins>sexual abuse or exploitation of a minor is appropriate under U.S.S.G.</ins>
                <ins>§ § 2G2.2(b)(5) and 4B1.5(b)(1).</ins>

3      An enhancement under U.S.S.G. § § 2G2.2(b)(5) and 4B1.5(b)(1) is appropriate

4 when the defendant engaged in at least two separate instances of sexual abuse of

5 exploitation of a minor. A pattern of conduct can be established whether or not it involved

6 charged offenses or different victims. Here, there are four charged sexual exploitation

7 victims. Each of those victims testified to being exploited multiple times and the contents of

8 Ditirro's SD card confirm the testimony of the charged victims. Additionally, although

9 A.P.'s sexual exploitation is not a charged offense,[10] there is no dispute that she was also

10 sexually exploited. Finally, there are countless other unknown victims whose exploitation

11 at the hands of Ditirro was documented in the same manner as the charged victims. As

12 such, the enhancements for engaging in a pattern of sexual abuse should apply.

13            vii.   <ins>The enhancement for use of a computer is appropriate under</ins>
                  <ins>U.S.S.G. 2G2.2(b)(6).</ins>

14

15      The testimony at trial established that Ditirro used a smart phone to commit the

16 charged offenses and used an SD card to retain evidence of his offenses. Both qualify as

17 "computers" under this enhancement.

            viii.   <ins>The enhancement for 600 or more images is appropriate under</ins>

18                 <ins>U.S.S.G. 2G2.2(b)(7)(D).</ins>

19      As calculated in the plea agreement, and based on the testimony presented at trial,

20 Ditirro's offenses involved 3,404 images. As such, this enhancement should apply.

21 ///

22 ///

23

24 ────────────────

[10]     Again, Ditirro's possession of the child pornography images he produced of A.P. supported the charge of possession of child pornography.

ix. <u>The enhancement for multiple counts is appropriate under U.S.S.G.
§ 3D1.4(a).</u>

Finally, the multiple count adjustment is properly applied. The four charges of
sexual exploitation do not group under the Guidelines and, as the individual offenses are
properly calculated, the multiple count adjustment is also accurate. As a result, Ditirro's
total offense level is properly determined to be 53. However, under the Guidelines, his
offense level is properly reduced to 43.

**B. Term Of Imprisonment**

The goal of sentencing is to "'impose a sentence sufficient but not greater than
necessary' to reflect the seriousness of the offense, promote respect for the law, and provide
just punishment; to afford adequate deterrence; to protect the public; and to provide the
defendant with needed . . . correctional treatment." *United States v. Carty*, 520 F.3d 984, 991
(9th Cir. 2008) (quoting 18 U.S.C. § 3553(a)). The Court considers the "the nature and
circumstances of the offense and the history and characteristics of the defendant," "the
need for the sentence imposed," "the kinds of sentences available," the applicable
sentencing guideline range, any pertinent policy statement, sentences imposed on other
similarly situated defendants, and the need for victim restitution. 18 U.S.C. § 3553(a).
Considering the relevant factors, the Court should impose a 140-year sentence.

A 140-year sentence is the only thing that can provide deterrence and protect the
community from Ditirro, who still refuses to accept that he destroyed the lives of countless
young girls. A lengthy sentence is the only thing that can impress upon Ditirro that this
criminal behavior is not tolerable in society and assure a measure of safety to the
community. A statutory maximum sentence is sufficient, but not greater than necessary, to

20

reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, and to protect the public.

In a recent case, Thomas Goodman who pleaded guilty to producing child pornography of *only three* victims was sentenced to 260 years.[11] Goodman pleaded guilty to eight counts of production for three victims and one count of possession of child pornography. A sentence of 260-years was reached in Goodman by imposing the statutory maximum sentence of 30 years on each of the eight counts of production and the statutory maximum sentence of 20 years on the single count of possession to run consecutive. The government's requested sentence in this case mirrors the same request – statutory maximum on each count to run consecutive. The government's requested sentence in this case reflects the independent, temporally and legally distinguishable acts that support each count of conviction, and to give adequate consideration to the need to reflect the seriousness of each offense against each victim separately, to promote respect for the law, and to provide just punishment.

Comparing Goodman's case to Ditirro's shows the reasonableness of the government's request. In *Goodman*, the videos and photos depicted two six-year-old children as well as images and videos of Goodman molesting a toddler-aged child. In sentencing Goodman, the district court accurately described the behavior in creating the child pornography as a "level of depravity [that] is beyond comprehension." Here, similarly, Ditirro's actions have gone well beyond the possession of child pornography and

---

[11]      Rhode Island Man Gets 260 Years for Making Child Porn, available at https://www.usnews.com/news/best-states/rhode-island/articles/2019-03-22/rhode-island-man-gets-260-years-for-making-child-porn; *see also* Rhode Island man sentenced to 260 years in federal prison in ICE HSI Boston child exploitation case, available at https://www.ice.gov/news/releases/rhode-island-man-sentenced-260-years-federal-prison-ice-hsi-boston-child-exploitation.

exhibit a level of depravity that defies comprehension. He has also escalated beyond receiving and distributing child pornography, engaging in an illicit market that re-victimizes those who have suffered sexual abuse by forcing them to not only re-live those traumatic events, but also live with the knowledge that others have seen them at their most vulnerable moments, and have received enjoyment from those images. Ditirro has taken the next egregious step and *created* new child exploitative material. He then preserved and organized his collection, to be referred to at his convenience. He has thus caused the charged victims, as well as those who have not yet been identified, to wonder when someone looks at them for a second too long, or seems to smile knowingly, whether that person has seen the images and videos documenting Ditirro's sexual exploitation. He has not only robbed the victims of their innocence, but also permanently deprived them of a sense of security.

While Goodman only had *three* victims, Ditirro has **48 victims.** Unlike Goodman, who readily admitted his guilt and accepted his punishment, Ditirro continues to obfuscate and attempt to detract from his undeniable guilt. Ditirro's "smug" arrogance caused five young girls to be re-victimized repeatedly when having to re-live and recount their sexual assaults at his hands. Although Goodman's victims were younger, Goodman's actions amounted to molestation and sexual contact rather than sexual penetration and rape. Ditirro forcibly raped two girls and used deception to groom two others into "willingly" engaging in their own sexual assaults. Ditirro is exponentially worse than a typical child molester who feels some level of guilt for the unquestionable depravity in which he engages. Ditirro takes sick joy and pleasure from forcing his victims to testify, demonstrating "his desire to remain in control of his victims." Accordingly, the government's request for a 140-year sentence for Ditirro's convictions is consistent with the

1   sentences imposed on similarly situated defendants across the country, and it is

2   substantively reasonable and warranted. A sentence of 140-years serves a strong deterrent

3   purpose to Ditirro and other pedophiles and child molesters like him who believe they can

4   "remain in control" by watching their victims reliving the worst horrors of their lives.

5       Further, it is important for this Court to consider Ditirro's repeated refusal to admit

6   any wrongdoing and accept responsibility for his actions. Notwithstanding the

7   overwhelming testimonial and forensic evidence facing Ditirro, he refused to admit the

8   truth. To be clear, the government is not asking for a trial tax, or for the Court to punish

9   Ditirro exercising his constitutional rights to a trial. But, as the Ninth Circuit has noted,

10  exercising a constitutional right is very different than putting forward a factually

11  unsupported and frivolous defense to distract from guilt. Ditirro's attempt at trial to claim

12  that the forensic evidence was somehow manufactured or altered is nothing more than a

13  delusion of grandeur.[12] Before trial Ditirro ridiculously claimed he was innocent because

14  the girls were his "girlfriends." Indeed, Ditirro even went so far as to claim, in a letter

15  written directly to this Court, that he was in a legitimate relationship with R.B. after she

16  was 16 years of age. *See* ECF No. 48. Of course, this claim was entirely false. But even if

17  true, Ditirro's claim that he believed R.B. to be 16 when he sexually exploited here still

18  demonstrated his undeniable guilt in producing child pornography. Still, Ditirro refused to

19  admit the logical legal implications of his own statements and proceeded to trial, requiring

20  the victims to testify about their graphic victimization in a room filled with strangers,

21

22  [12]     As government counsel argued in rebuttal, any argument regarding the chain of
    custody for the SD card is futile when considered in light of the incontrovertible fact that
23  the photos and videos contained on that SD card clearly depict Ditirro having sex with
    underage females. Law enforcement could have found the SD card on the street with no
24  explanation as to how it got there and the evidence would have still unequivocally
    established Ditirro's guilt.

people they met in the days before trial, this Honorable Court, and Ditirro. Of course, all of Ditirro's factually unsupportable defenses were flatly rejected by the jury. Ditirro's refusal to accept responsibility up to the present day, even in light of what is painfully obvious to any reasonable observer of the trial proceedings, should be considered by this Court with great concern. In light of Ditirro's obstinate refusal to acknowledge his crimes and accept responsibility, this Court can have no assurance that anything other than a period of incarceration spanning Ditirro's natural life will deter him from re-committing the offenses for which he has been found guilty. If Goodman was deserving of 260 years, then sentencing Ditirro to 140 years will avoid sentencing disparities and will impose a sufficient but not greater than necessary sentence.

### C. Supervised Release

The government concurs that Ditirro be ordered to serve a lifetime term of supervised release as to all five counts. If the Court imposes the government's requested sentence, it is unlikely that Ditirro will serve any term of supervision. However, the egregiousness and escalation of Ditirro's conduct warrants the maximum term of supervision as a matter of fact and principle. The facts of this case strongly suggest that Ditirro's rehabilitation, success, and any likelihood to re-offend will be reduced if he remains accountable for his rehabilitation under supervision.

## IV.   Conclusion

This Court should give proper weight to the significance of Ditirro's crimes, the facts of this case, and the statements of the victims and their families. Doing so will lead to the conclusion that a statutory maximum sentence is not only appropriate, but also fundamentally sufficient but not greater than necessary to meet the goals of sentencing. Ditirro robbed these girls of their childhoods and by all indications the peace and happiness of their adult lives as well. He did so for no other reason than his sick pedophilic pleasure. He is a criminal. He is a sexual predator. He is a thief who stole the innocence of at least 48 children. Society must be protected from him for as long as humanly possible, especially given his utter lack of remorse for any of his actions.

The United States requests that this Court sentence Ditirro to 140 years' custody and lifetime supervision. Any downward adjustment would negate the seriousness of this offense, fail to deter future misconduct, fail to protect the public, and result in unwarranted sentencing disparities. Based on the totality of circumstances, the requested 140-year sentence is sufficient but not greater than necessary to comply with the §3553 factors.

Dated this the 24th day of April 2019.

Respectfully Submitted,

NICHOLAS A. TRUTANICH
United States Attorney
//s//
ELHAM ROOHANI
CHRISTOPHER BURTON
Assistant United States Attorneys

**Certificate of Service**

I hereby certify that on April 24, 2019, I electronically filed the foregoing Sentencing Memorandum with the Clerk of the Court for the United States District Court for the District of Nevada using the CM/ECF system.

*s/ Christopher Burton*
CHRISTOPHER BURTON
Assistant United States Attorney
United States Attorney's Office
